IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CHERYL K. WOLFE                                                    PLAINTIFF

V.                          Civil No. 2:21-cv-02057-PKH-MEF

KILOLO KIJAKAZI[1], Acting Commissioner,
Social Security Administration                                     DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Cheryl Wolfe, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I.        Procedural Background

Plaintiff protectively filed her application for DIB on April 1, 2018[2], alleging disability since February 1, 2017, due to chronic obstructive pulmonary disease ("COPD"), irritable bowel syndrome ("IBS"); osteoporosis; osteoarthritis ("OA"); hip pain; degenerative disk disease ("DDD"); low oxygen; and depression.[3] (ECF No. 14, pp. 162-165, 228, 245). An administrative

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] Plaintiff amended her application for benefits on January 28, 2019. (ECF No. 14, pp. 162-165).
[3] A prior application for benefits was denied by ALJ Alex Murdock on October 11, 2016. (ECF No. 14, pp. 54-66).

hearing was held telephonically on June 18, 2020. (*Id.* at 31-46). Plaintiff was present and represented by counsel.

Plaintiff was 50 years old[4] on her alleged onset date and possessed a high school education. (ECF No. 14, p. 74). She has past relevant work ("PRW") experience as a cashier and salesperson in a garden center. (*Id.* at 230).

On August 3, 2020, the Hon. Bill Jones, Administrative Law Judge ("ALJ"), identified Plaintiff's DDD and COPD as severe impairments. (ECF No. 14, p. 18). He concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 19). Further, despite Plaintiff's impairments, the ALJ found she retained the RFC to perform light work that did not require concentrated exposure to extreme fumes, odors, dusts, gases, and/or poor ventilation. (*Id.*). At step four, the ALJ then concluded the Plaintiff could perform her PRW as a retail cashier. (*Id.* at 24).

The Appeals Council denied Plaintiff's request for review on January 5, 2021. (ECF No. 14, pp. 5-9). Plaintiff subsequently filed this action on March 11, 2021. (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 17, 18), and the matter is ready for Report and Recommendation.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154

---

[4] The Commissioner has indicated that the Plaintiff was 50 years and 9 months old on her alleged onset date, which equates with closely approaching advanced age. (ECF No. 14, p. 74).

(2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).  If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision.  *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  *See* 20 C.F.R. § 404.1520(a)(4).  The fact finder only

considers Plaintiff's age, education, and work experience in the light of her RFC if the final stage of the analysis is reached.  20 C.F.R. § 404.1520(a)(4)(v).

### III.       Discussion

Plaintiff raises several issues on appeal: (1) whether the ALJ performed the psychiatric review technique ("PRT") at step two; (2) whether the ALJ's RFC determination is supported by substantial evidence; (3) whether the ALJ properly assessed the credibility of Plaintiff's subjective complaints; (4) whether the ALJ fully and fairly developed the record regarding her PRW; (5) whether res judicata prevented the ALJ from reconsidering the Plaintiff's PRW; and (6), whether the ALJ properly applied the age provisions.[5]

### A.       Psychiatric Review Technique and Step Two

Initially, Plaintiff contests the ALJ's Step Two finding that she has no severe mental impairments.  She supposes that her major depression and PTSD were "serious diagnoses" requiring prescriptions for both Zoloft and Hydroxyzine.  At Step Two, a claimant has the burden of providing evidence of functional limitations in support of their assertion of disability.  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Id*. (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)).  "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two."  *Id*. (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)).

The present record does reveal a history of depression and anxiety, dating back to at least 2015.  (ECF No. 14, pp. 369-376).  At that time, an advanced nurse practitioner ("ANP"), Treyce

---

[5] The Court has chosen to address Plaintiff's issues out of order.

Hunt, prescribed Amitriptyline. Thereafter, examinations conducted in connection with office visits for other impairments indicate that she was alert, fully oriented, and presented with a normal mood, affect, and behavior. (*Id*. at 480-483, 686-689). She did not, however, complain of depression again until August 3, 2018, when establishing care with Dr. Michael McAlister. (*Id*. at 477-480, 682-686). At that point, Plaintiff reported "multiple stressors with her family" and frequent agitation. Dr. McAlister diagnosed chronic depression and prescribed Zoloft (interchangeably referred to by its generic name, Sertraline).

When she returned two weeks later, Plaintiff made no mention of depression and Dr. McAlister noted a normal mental status exam. (ECF No. 14, pp. 457-470, 474-477, 663-676, 680-682). In fact, he documented a normal mood and affect with good judgment and insight through December 2018. (*Id*. at 471-474, 676-679). He did, however, increase her Zoloft dosage in December, stating that her mood had not improved as much as he had hoped. (*Id*. at 457-460, 663-666).

On January 16, 2019, Plaintiff reported that her depression and anxiety were "still not controlled with the Sertraline." (ECF No. 14, pp. 453-457, 659-663). She felt she needed to discuss her stressors with a therapist. Noting her mood to be both anxious and depressed, Dr. McAlister agreed.

Six days later, the Plaintiff established care at Counseling Associates for diagnoses of major depression and post-traumatic stress disorder ("PTSD"). (ECF No. 14, pp. 761-774). She reported a dysfunctional family history, having been raped by her father at age 9, who also struggled with mental health issues. He purportedly threatened to kill her if she told anyone about the rape, tried to burn their house down with kerosene, and even attempted to shoot family members. Her family situation deteriorated further when her mother took her children away after

her ex-husband allegedly beat her.  Although the Plaintiff maintained legal custody of the children, her mother reportedly removed them from Plaintiff's home, giving her youngest son to her ex-husband.   This resulted in strained relationships with her mother, her children, and her grandchildren.

Plaintiff presented for her first counseling appointment with Christine Gustus on January 24, 2019.  (ECF No. 14, pp. 758-760).  She reported frustration over her current living situation and anxiety regarding her disability application.  Ms. Gustus noted her to be anxious but engaged with a guarded prognosis.

Four days later, Ms. Gustus documented minimal progress, noting her to be agitated with fast/pressured speech.  (ECF No.14, pp. 755-757).  She had reportedly had a meltdown on her mom the previous day and was experiencing severe physical pain after walking three blocks.  Later that day, Dr. McAlister also noted an anxious and depressed mood, but no medication changes were made.  (*Id*. at 450-453, 485, 656-659, 690).

On January 31, 2019, Dr. McAlister completed a Mental RFC, indicating that the Plaintiff had no useful ability to perform at a consistent pace without an unreasonable number and length of rest periods, work without deterioration or decompensation causing her to withdraw from a situation, and work without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors.  (ECF No. 14, p. 627).

Plaintiff returned to Ms. Gustus in February, after reportedly being ill.  (ECF No. 14, pp. 752-754).  Ms. Gustus noted some progress in Plaintiff's ability to focus on her needs and self-care with an "ok" mood.  Plaintiff was relieved to learn that menopause could be at least partially responsible for her thoughts and mood issues.  When Dr. McAlister evaluated her later that day,

he noted her to be alert and fully oriented with an anxious and depressed mood but good judgment and insight. (*Id*. at 440-444, 646-650). He added Hydroxyzine to her medication regimen.

The following month, Plaintiff had reportedly discontinued her relationship with her boyfriend to focus on herself. (ECF No. 14, pp. 749-751). Ms. Gustus noted an improved mood, attitude, and outlook. She was even getting along better with her mother and youngest son.

During visits with ear, nose, and throat specialist ("ENT"), Ezechial Nehus, M.D., and advanced practical registered nurse ("APRN"), JoAnn Mahan at Arkansas Liver and Gastroenterology, in May 2019, Plaintiff's mental status exam was noted to be unremarkable. (ECF No. 14, pp. 787-790, 833-836). And, although Dr. McAlister documented an anxious mood and affect on May 29, no medication adjustments were made. (*Id*. at 637-640, 855-857).

On June 25, Dr. Chester Carlson conducted a general physical exam. (ECF No. 14, pp 609-620). He found her to be alert and fully oriented with no signs of psychosis or a serious mood disorder.

On June 28, 2019, agency physician, Margaret Podkova, Psy.D., completed a psychiatric review technique form, concluding that the Plaintiff's depression and anxiety were not severe, as they resulted in no restriction of her ability to understand, remember, or apply information and only mild restrictions in her ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. (ECF No. 14, pp. 80-82).

Exams conducted through September 2019 remained within normal limits. (ECF No. 14, pp. 802-813, 817-820, 823-825). On September 20, Dr. Abesie Kelly conducted an independent review of the record, affirming Dr. Podkova's PRTF findings and reiterating that the Plaintiff's mental impairments were not severe. (*Id*. at 97-98).

In November 2019, Dr. Carl Schoenberger treated the Plaintiff for complaints related to her COPD.  (ECF No. 14, pp. 845-849).  Although he diagnosed her with anxiety/depression, Dr. Schoenberger noted a normal mood and affect with good judgment.

Dr. McAlister also noted a normal mental status exam in February 2020, while treating the Plaintiff for skin lesions and back pain.  (ECF No. 14, pp. 840-844).  Thereafter, no further mention of the Plaintiff's mental health or mental status was made until May 2020, when APRN Angela Chukwuanu simply documented her history of depression and anxiety.  (*Id*. at 885-888, 919-920). The following month, she noted a depressed mood and affect while assessing the Plaintiff for chronic pain syndrome.  (*Id*. at 915-918, 934).

After reviewing this evidence, the Court finds substantial evidence to support the ALJ's step two findings.  While the Plaintiff was diagnosed with major depression and PTSD, she failed to follow through with professional mental health treatment for these impairments.  Further, mental status exams conducted during the relevant period were overwhelmingly normal documenting no evidence of a severe impairment that affected the Plaintiff's ability to work.

While we are cognizant of Dr. McAlister's mental RFC assessment, we can find no evidence in the record to support his findings.  In fact, his own treatment notes document minimal anxiety and depression, at best.  After prescribing Hydroxyzine in February 2019, he made no other medication changes or adjustments.  Instead, it appears as though the Plaintiff's mental impairments were responsive to the medications prescribed. *Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling).  We can also ascertain no evidence to suggest the Plaintiff's condition warranted anything more than conservative treatment, as she was never hospitalized for her impairments and consistently denied both suicidal and homicidal ideations.  As such, we find

substantial support for the ALJ's adoption of the agency physicians' opinions finding non-severe mental impairments.  *See* 20 C.F.R. § 404.1520a(d)(1) (finding mild limitations in first three functional areas and no limitations in fourth area results in a conclusion that mental impairment is not severe).

The undersigned also finds no merit in the Plaintiff's contention that the ALJ's failure to order a consultative mental exam warrants remand.  The Eighth Circuit has held that an ALJ is not required to order a consultative evaluation of every alleged impairment; he simply has the authority to do so if the existing medical sources do not contain sufficient evidence to make an informed decision.  *See Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011) (ALJ is required to order tests and medical examinations only if medical records presented to him give insufficient medical evidence to determine if claimant is disabled); *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (reversal for failure to develop record is warranted only when such failure is unfair or prejudicial). Because the present record contains ample evidence upon which the ALJ could conclude that the Plaintiff's mental impairments were not severe, no further development was required.

Contrary to Plaintiff's assertion, the mere fact that the non-examining RFC assessments were completed before all the medical evidence was submitted does not necessarily require remand.  When, as is the case here, the additional evidence fails to indicate that the Plaintiff's mental condition had deteriorated since the RFCs were completed, the ALJ properly utilized those assessments in his RFC determination.

Further, Plaintiff's argument that the ALJ failed to conduct a proper psychiatric review technique is unconvincing.  An additional "special technique" (the "PRT") is required when evaluating "mental impairments." 20 C.F.R. § 404.1520a(a) ("[W]hen we evaluate the severity of mental impairments . . . we must follow a special technique at each level in the administrative

review process."); *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007). Both the PRT and the findings and conclusions based on the PRT must be documented in the ALJ's written decision. 20 C.F. R. § 404.1520a(e)(4).

A review of the ALJ's decision reveals that he did conduct a proper PRT. The decision reads as follows:

> The claimant has the following degree of limitation in the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20 CFR, Part 404, Subpart P, Appendix 1: No limitation in understanding, remembering, or applying information; Mild limitation in interacting with others; Mild limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing oneself. Mental status examinations showing largely benign findings and the claimant's reported daily activities support at most mild mental limitations. In addition, the claimant worked after the alleged onset date. She testified that she worked as a home health aide and only stopped working because she was unable to lift her patients. The claimant testified that she assisted her patients with performing their daily activities. In the *Function Report-Adult*, the claimant reported that she is able to prepare meals, complete household chores, drive, shop, manage her finances and spend time with others. (Exhibit B5E). Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1)).

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

> State agency psychological consultants, Margaret Podkova, Psy.D. and Abesie Kelly, Ph.D. opined that the claimant's anxiety and depression are non-severe. (Exhibits B3A; B5A). The undersigned finds their opinions persuasive because it is consistent with the medical evidence of record showing her mental impairments are stable and managed with conservative treatment. (ECF No. 14, pp. 18-19).

Based on this information and the record, we find that the ALJ properly applied the PRT and provided support for his decision. We find no error.

## B.     RFC Determination

Plaintiff also maintains that the ALJ's RFC determination is not supported by substantial evidence.  RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545. A disability claimant has the burden of establishing her RFC.  *Vossen*, 612 F. 3d at 1016.  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

Plaintiff insists that the ALJ's RFC determination was improperly based on the assessments prepared by the non-examining physicians before most of Plaintiff's medical records were admitted into evidence, including the treatment records and RFC assessments of Dr. McAlister, records from pain specialist, Mohamed Tolba, M.D., and records from podiatrist, Vafa Ferdowsian, D.P.M.  Further, she asserts that the general physical examination conducted by Dr. Carlson is incomplete, as it does not contain an actual RFC assessment.  For the reasons discussed below, we disagree.

The pertinent medical records reveal the following:

11

In 2015, the Plaintiff began reporting back pain radiating into her right hip and buttocks resulting from degenerative changes.  (ECF No. 14, pp. 377-387, 411-420, 422).  She also has a lengthy history of COPD and chronic sinusitis that required frequent prescriptions for antibiotics, steroids, inhalers, and nebulizer treatments.  (*Id*. at 377-410, 422-423, 440-474 480-483, 526-527, 637-640, 676-679, 686-689).  Further, most of her physical exams documented at least mild expiratory wheezing.

X-rays conducted in February 2018 showed mild multilevel degenerative changes in the lumbar spine and hips.  (ECF No. 14, pp. 732-733).  Due to trigger points bilaterally at the L5-S1 level and tenderness over both greater trochanters, an orthopedist, Michael Wolfe, M.D., recommended trigger point injections ("TPIs").  (*Id*. at 728-731).  Dr. Wolfe administered repeat TPIs in April 2018 and prescribed Mobic when Plaintiff's mechanical back pain returned.  (*Id*. at 726-728).  Plaintiff reported that bending and activity aggravated her pain.

On August 3, 2018, x-rays of Plaintiff's lumbar spine revealed mildly prominent lordosis, some minimal facet degenerative change at the L5-S1 level, and minimal degenerative change in the sacroiliac joints.  (ECF No. 14, pp. 499, 705).  On exam, Dr. McAlister documented moderate pain to flexion and extension of the lumbar spine, muscle spasms in the lumbar region, a positive straight leg raise test on the right, and numbness and tingling down her right leg.  (*Id*. at 474-477, 680-682).  He ordered an MRI and a bone density scan.  The bone density scan confirmed osteopenia with a bone mineral density between 10 and 25 percent below normal, placing her at moderate risk of fracture.  For this, Dr. McAlister prescribed Alendronate.  (*Id*. at 493, 498, 699-704).  The MRI, conducted on August 27, 2018, showed mild facet hypertrophic change with hypertrophy of the ligamentum flavum at the L3-4 level and bilateral nerve root sleeve cysts at the L5-S1 level.  (*Id*. at 491-492, 697-698).

Pulmonary function tests ("PFTs") conducted in October 2018 revealed a moderately severe obstruction that markedly improved post administration of a bronchodilator.  (ECF No. 14, pp. 488-491, 694-696).

In November 2018, Dr. McAlister noted pain and mild crepitus in the left shoulder with external rotation and abduction against resistance and crepitus and pain with flexion and extension of the right knee.  (ECF No. 14, pp. 460-464, 666-670).  For this, he administered steroid injections into her right knee and left shoulder.

The following month, Plaintiff reported a three-month history of pain in her left posterior forearm, making it difficult for her to lift pans with her left upper extremity.  (ECF No. 14, pp. 457-460, 663-666).  On exam, she exhibited pain and weakness with a positive Tinel's sign to the ulnar nerve.  Dr. McAlister opined that her ulnar nerve might be compressed.  However, x-rays of her elbows were unremarkable.  (*Id*. at 487-488, 693).

On December 20, 2018, a pulse oximetry study indicated that the Plaintiff would was desaturating during the night and would benefit from home oxygen.  (ECF No. 14, pp. 486-487).  Therefore, nocturnal oxygen was prescribed.

On January 28, 2019, Plaintiff returned to Dr. McAlister with complaints of moderately severe pain in her right hip, stating that the pain intensified with ambulation.  (ECF No. 14, pp. 450-453, 485, 656-659, 690).  An exam revealed a limited range of motion in her hip, moderate pain with flexion and extension, and a positive straight leg raise test on the right.  Dr. McAlister administered a Toradol injection.  During a counseling appointment later that day, Ms. Gustus noted her to be limping and favoring her right leg.  (*Id*. at 755-757).  She reported severe pain after walking three blocks, despite having undergone a pain injection prior to her appointment.

On January 31, 2019, Dr. McAlister completed a Medical Source Statement indicating the Plaintiff could lift/carry 10 pounds frequently and 25 pounds occasionally; could stand and/or walk for a total of three hours per day; and could sit for a total of four hours per day with work breaks at will.  (ECF No. 14, pp. 447-450, 625-626, 628-630).  Further, he noted that she must lay in a supine position for two hours per day and could perform any work activities in a normal workday for a total of two hours; could reach and grip for one-third to two-thirds of the workday; could handle, finger, and feel for two-thirds of the workday; and must avoid all exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards.  Dr. McAlister explained that his conclusions were based on Plaintiff's MRI and PRT results.

In May 2019, Dr. McAlister administered a Toradol injection to treat Plaintiff's left hip pain.  (ECF No. 14, pp. 637-640, 855-857).  The Plaintiff reported that changes in the weather aggravated her condition.

On June 25, 2019, at the Commissioner's request, Dr. Chester Carlson conducted a general physical examination of the Plaintiff.  (ECF No. 14, pp. 609-620).  Although there were no range of motion deficits, atrophy or sensory or gait abnormalities, Plaintiff did report pain with each task performed.  Dr. Carlson assessed no limitations.

Four days later, agency physician, Elizabeth Berry, M.D., reviewed the record and concluded that the Plaintiff could perform a full range of light work.  (ECF No. 14, pp. 83-85).

On August 13, 2019, ENT Ezechiel Nehus, M.D., performed a bilateral endoscopic maxillary antrostomy, ethmoidectomy, frontal sinusotomy, sphenoidotomy, and inferior submucosa resection with an outfracture endoplasty to correct her chronic rhinosinusitis, deviated nasal septum, and inferior turbinate hypertrophy.  (ECF No. 14, pp. 814-816).  Due to continued

problems the following month, Dr. Nehus performed a debridement of Plaintiff's nasal mass.  (*Id.* at 802-804).  Thereafter, she reported no further problems with chronic sinusitis.

While consulting with pulmonologist, Carl Schoenberger, M.D., in September 2019, the Plaintiff reported "bad arthritis" in her right hip, stating that it inhibited her ability to exercise. (ECF No. 14, pp. 849-855).  Dr. Schoenberger noted a limited range of motion in the right hip and clear lungs.  He diagnosed degenerative joint disease and COPD, noting Plaintiff's previous PFT results and reports of good relief with her Pro Air inhaler.  Accordingly, he ordered updated PFTs and a sleep study.

On September 19, 2019, Dr. Jonathan Norcross conducted an independent review of the record and affirmed Dr. Berry's restriction to light work.  (ECF No. 14, p. 100-102).

X-rays of Plaintiff's lumbar spine conducted in October 2019 documented mild DDD and facet arthropathy in the lower lumbar.  (ECF No. 14, p. 942).

Upon her return to Dr. Schoenberger in November 2019, he noted that the sleep study had revealed no evidence of obstructive sleep apnea, further her lungs remained clear.  (ECF No. 14, pp. 931-933).  Plaintiff indicated that she was smoking but wanted to quit again.  Dr. Schoenberger refilled her Incruse Ellipta[6] and Albuterol prescriptions and prescribed Chantix.

Rheumatologist, Lue Cummins, M.D., evaluated the Plaintiff on January 13, 2020, for spondylosis affecting her cervical and lumbar spine.  (ECF No. 14, pp. 931-933).  Plaintiff reported that she had received a TPI from Dr. Wolfe but never returned for further treatment.  Dr. Cummins documented mild pain with motion in the cervical spine, moderate pain with motion and tenderness in the lumbar spine, and pain in both feet/ankles.  As such, he referred the Plaintiff to a podiatrist.

---

[6] Incruse Ellipta is a medication used to treat the symptoms of COPD.  *See* Incruse Ellipta, *at* https://incruse.com/ (last accessed July 15, 2022).

In February 2020, podiatrist, Vafa Ferdowsian, D.P.M., treated the Plaintiff for complaints of pain in her feet, including pain with weightbearing. (ECF No. 14, pp. 906-907).  X-rays of her right foot showed a missing sesamoid and slight cystic changes in the first metatarsal head.  An exam also revealed normal sensation, an adequate range of motion in the ankle, full strength in both lower extremities, an incision into the medial first metatarsal phalangeal joint and hallux on the right; post operative pain in the distal second and third interspaces bilaterally, right greater than left with edema; pain on side-to-side compression of the metatarsals on each other, and a positive Mulder's sign.  Dr. Ferdowsian administer a steroid injection into the third interspace on the right and discussed heat molded insoles, which the Plaintiff declined.

That same day, Dr. McAlister noted muscle spasms in the lumbar spine, as well as pain with flexion and extension.  (ECF No. 14, pp. 840-844).  He indicated, however, that her COPD was well controlled with Incruse Ellipta and Pro Air and her back pain was responsive to Meloxicam and Robaxin.

On March 4, 2020, Plaintiff reported that the steroid injection into her foot had been helpful, but she refused a second one.  (ECF No. 14, pp. 904-905).  That same day, Plaintiff established with pain specialist, Dr. Mohamed Tolba, M.D., at Arkansas Spine and Pain, for the treatment of her lower back pain.  (ECF No. 14, 889-901, 923-930, 948-957).  She indicated that the medication prescribed to treat her back pain was helpful, rating her pain as a four on a 10-point scale.  A physical exam revealed bilateral tenderness in the L3-S1 region; pain over the lumbar intervertebral spaces; sacroiliac joint tenderness on the left; anterior flexion of the lumbar spine to 40/60 degrees with pain; lumbar extension to 10/25 degrees with pain; palpable trigger points in the muscles and joints; and positive Gaenslen's, Yeoman's, and Patrick's tests on the left indicating the present of sacroiliac joint dysfunction.  After ordering an updated MRI, Dr. Tolba

ordered bilateral lumbar medial branch blocks and prescribed Flexeril.  The MRI showed mild bilateral facet degeneration at the L3-4 and L5-S1 levels.  (*Id.* at 937-938).

In May, the Plaintiff returned to Arkansas Spine and Pain with continued complaints of lower back pain.  (ECF No. 14, pp. 885-888, 919-922).  On May 28, Dr. Tolba administered medial branch nerve blocks.  (*Id*. at 935-936).  Upon her return the following month, APRN Angela Chukwuanu documented a full range of motion in her neck with pain and an unchanged lumbar exam.  (*Id*. at 915-918, 934).  She administered a trigger point injection into Plaintiff's paraspinal muscles and refilled her Flexeril prescription.

Five days later, Dr. McAlister prescribed a quad cane for a diagnosis of degeneration of the lumbar intervertebral disk.  (ECF No. 14, 912).

After reviewing the evidence, the Court finds that the objective medical evidence, coupled with the conservative nature of Plaintiff's treatment, her response to the treatment prescribed, and her activity level fail to support her allegations of severe, disabling pain.  While we do agree that the non-examining physicians did not have access to all the medical evidence of record, the RFC determination is a question reserved to the Commissioner.  *Perks*, 687 F.3d at 1092 (claimant has burden of establishing RFC; while RFC assessment draws from medical sources for support and must be supported by some medical evidence, it is ultimately administrative determination reserved to Commissioner).  There is no requirement that the RFC finding be supported by specific medical opinion.  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  And, here, the ALJ acknowledged that, although additional evidence was submitted after those opinions were rendered, that evidence failed to document a material change in the Plaintiff's condition.  Therefore, we find that the ALJ properly considered the RFC assessments in combination with the

after submitted evidence, including Dr. McAlister's treatment records and medical source statement.

We do not, however, find substantial evidence to support Dr. McAlister's extremely restrictive opinion.  His physical exams documented largely benign findings; the objective testing revealed mild to moderate degenerative changes with no disk herniations, bulges, or nerve root involvement; Plaintiff's treatment was conservative in nature; and Plaintiff responded well to both the medications and injections prescribed.  Although the Plaintiff was also treated for pain in her feet, the injections administered were reportedly helpful.  And, while Dr. McAlister did prescribe a quad cane in June 2020, physical exams failed to document long-term gait abnormalities resulting from either Plaintiff's feet or her back warranting the prescription.  Therefore, we find substantial support in the record for the ALJ's determination that the Plaintiff can perform light work with no concentrated exposure to extreme fumes, odors, dusts, gases, and/or poor ventilation.

### C.      Subjective Complaints

Plaintiff next argues that the ALJ failed to properly consider her subjective complaints, focusing instead on the absence of objective evidence to support her claim.  The ALJ is required to consider all the evidence relating to Plaintiff's subject complaints, including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  In so doing, he must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians.  *Polaski*, 739 F.2d at 1322.

An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them.  *Id*.  However, "[a]n ALJ . . . may disbelieve subjective reports

because of inherent inconsistencies or other circumstances." *Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted)). The Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

While the ALJ did properly consider the absence of objective evidence to support the Plaintiff's claim, he also noted the conservative nature of Plaintiff's treatment, her response to said treatment, work performed after her alleged onset date, and her daily activities. The record makes clear that the Plaintiff received only conservative treatment for her impairments, namely medication and injections. *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (holding conservative treatment is inconsistent with disability). Although she did receive emergency treatment on a few occasions, primarily related to her abdominal complaints, none of her impairments warranted hospitalization or surgical correction. Further, Plaintiff's impairments responded well to the treatment prescribed. The side effects reported were minimal and addressed with medication adjustments and/or changes. *See Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004) (alleged side effects were properly discounted when plaintiff did not complain to doctors).

Further, the Plaintiff returned to work as a home health aide for approximately 10 months after her alleged onset date. (ECF No. 14, pp. 33-34). *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (inferring impairment was not disabling from history of work and absence of evidence of material deterioration). She quit when she was unable to turn a 350-pound patient, not because her physical or mental impairments prevented her from continuing to work. (ECF No. 14, p. 37). *Goff*, 421 F.3d at 792-793 (holding that leaving work for reasons other than disability is a relevant consideration).

Despite her alleged disabling impairments, the ALJ also noted Plaintiff's admission that she could prepare meals, complete household chores, drive, shop in stores, go out alone, manage her finances, spend time with others, watch television, and occasionally sew.  (ECF No. 14, pp. 246-253).  *See Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir. 1997) (finding ability to dress, bathe, do some housework, cook, and shop consistent with ability to perform light work).

The ALJ also properly considered Plaintiff's smoking history and its effect on her lung impairments.  Plaintiff was diagnosed with COPD and urged by her doctors to quit smoking.  While she did successfully use Nicotine patches to quit smoking, in February 2020, Plaintiff reported that she had smoked two to three cigarettes the previous week.  (ECF No. 14, p. 844).  *See Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (holding Plaintiff's failure to stop smoking despite suffering from respiratory problems undermined subjective complaints).  The record makes clear that smoking exacerbated her COPD symptoms.

For all these reasons, we conclude that the ALJ properly considered Plaintiff's subjective complaints.

### D.      Duty to Develop the Record Regarding PRW

Plaintiff contends that the ALJ failed to properly develop the record regarding her PRW as a retail cashier.  An individual is not disabled if they retain the capacity to perform either their past relevant work as it was actually or generally performed in the national economy.  *Evans v. Shalala*, 21 F.3d 832, 833-834 (8th Cir. 1994) (quoting SSR 82-61 (1982)); *see also* 20 C.F.R. § 404.1560(b)(2); *Wagner v. Astrue*, 499 F.3d 842, 853-854 (8th Cir. 2007).  In determining whether the claimant can perform her PRW, the ALJ should only consider work that (1) was performed in the last 15 years, (2) lasted long enough for the claimant to learn to do it, and (3) qualified as substantial gainful activity ("SGA").  *See Terrell v. Apfel*, 147 F.3d 659, 661 (8th Cir. 1998); 20

C.F.R. § 404.1565.  SGA is work activity that involves doing significant physical or mental activities for pay or profit.  *Id.*; § 404.1572(b).  A claimant's earnings "will ordinarily show" that a claimant has engaged in SGA if the earnings averaged more than $830 a month for the calendar year 2005; $1000 per month for 2011; and $1,010 per month for 2012.  PROGRAM OPERATIONS MANUAL SYSTEM ("POMS") DI 10501.015B, *at* www.sss.gov/oact/cola.sga.html (last accessed July 25, 2022) (applying 20 C.F.R. § 404.1574(b)(2)(ii)).  However, the fact that earnings are not substantial will not necessarily show the claimant is not able to perform SGA.  *Id.*; § 404.1574(a)(1).  Work may be substantial even if it is performed on a part-time or seasonal basis. *Id.*; § 404.1572(a); *see also Reeder v. Apfel*, 214 F.3d 984, 989 (8th Cir. 2000).

The ALJ has "a duty to fully investigate and make explicit findings as to the physical and mental demands" of the Plaintiff's PRW and to compare those to the Plaintiff's RFC before determining whether she can return to her PRW.  *See Nimick v. Secretary of Health & Human Services*, 887 F.2d 864, 865-866 (8th Cir. 1989).  In so doing, the ALJ must use caution to consider the Plaintiff's specific PRW and avoid painting the Plaintiff's PRW "with an overly broad brush," by simply considering a similar definition.  *Evans*, 21 F.3d at 833-834; 20 C.F.R. § 404.1560(b)(2); *Wagner*, 499 F.3d at 853-54.

On October 11, 2016, Plaintiff's prior application for benefits was denied by ALJ Alexis Murdoch.  (ECF No. 14, pp. 54-66).  In said decision, the ALJ concluded Plaintiff could not perform her PRW as a department manager, retail store manager, or home health aide because those positions "required interpersonal interaction in excess of what is provided for by her" RFC. (*Id.* at 64).  There was no mention or discussion of the cashier position.

When ALJ Bill Jones considered Plaintiff's PRW in August 2020, in connection with her current application for benefits, he found her capable of performing her PRW as a retail cashier,

as this position was both actually and generally performed.  (ECF No. 14, p. 24).  The ALJ noted that the Plaintiff had worked as a cashier at Walmart for three months in 2011 and at Shell from November 1, 2005, until January 1, 2006.

At the administrative hearing in June 2020, Plaintiff and her attorney admitted that she had returned to work in late 2017, working as a home health aide for the Area Agency on Aging, for approximately 10 months.  (ECF No. 14, pp. 33-34).  Prior to that, Plaintiff testified that she worked in the lawn and garden department at Walmart, after being promoted from the position of cashier.  (*Id*. at 34-35).  She explained that she had worked as a cashier for approximately three months prior to said promotion, but she was neither asked to provide nor did provide information regarding the requirements of the cashier position.  Contrary to the Plaintiff's assertion on appeal, she did not seem uncertain as to how long she performed this position.  Further, earnings records indicate that she began her work at Walmart in October 2011, earning $2,277.19 that year ($715) per month, and continued working at Walmart through 2014.  (*Id*. at 179, 187).  She earned $14,012.32 in 2012 ($1,167.69 per month); $17,264.66 in 2013 ($1,438.72 per month); and $18,855.90 in 2014 ($1,571.33 per month).

Although her work history report makes no mention of the Walmart cashier position or its requirements, it does contain a partial[7] description of the cashier position at Shell, which the Plaintiff said required her to frequently lift 25 pounds, stock shelves and coolers, sweep, mop, and take out the trash.  (ECC No. 14, pp. 236-243).  A review of Plaintiff's earnings records reveals that she worked for both a Tiger Mart and an LMC Convenience Store in 2005.  (*Id*. at 183-184).  However, given Plaintiff's indication that she worked full-time at this position for two months and earnings records suggest that the Tiger Mart position was of a shorter duration, the LMC

---

[7] Plaintiff also indicates that she cannot remember "much" about the job.  (ECF No. 14, p. 239).

Convenience Store seems the more likely employer.  She earned a total of $1,416.00 from this employer or $708 per month.

Jim Spragins, the vocational expert ("VE"), analogized both cashier positions to that of a retail cashier (DOT # 211.462-014), which is categorized as semi-skilled light duty work with a specific vocational preparation ("SVP") level of 3[8].  The Dictionary of Occupational Titles defines the position as follows:

> Operates cash register to itemize and total customer's purchases in grocery, department, or other retail store: Reviews price sheets to note price changes and sale items.  Records prices and departments, subtotals taxable items, and totals purchases on cash register.  Collects cash, check, or charge payment from customer and makes change for cash transactions.  Stocks shelves and marks prices on items. Counts money in cash drawer at beginning and end of work shift.  May record daily transaction amounts from cash register to balance cash drawer.  May weigh items, bag merchandise, issue trading stamps, and redeem food stamps and promotional coupons.  May cash checks.  May use electronic scanner to record price.  May be designated according to items checked as Grocery Checker (retail trade).

DICTIONARY OF OCCUPATIONAL TITLES § 211.462-014.  Mr. Spragins later opined that an individual of Plaintiff's age, education, and work experience with the ability to perform light work involving no concentrated exposure to fumes, odors, dusts, gases, or poor ventilation could perform the Plaintiff's PRW as a retail cashier.

While the Court agrees that the record is not developed as to the specific requirements of the cashier position at Walmart, it does contain a description of the duties of the cashier position at Shell, which the Plaintiff performed for the requisite period to learn the position.  *See* Social Security Ruling ("SSR") 82–62 (the claimant is the primary source for vocational documentation and statements by the claimant regarding PRW are generally sufficient to determine the skill level, exertional demands and non-exertional demands of such work).  It is reasonable to conclude that a cashier at Walmart would perform many of the same job duties as would a cashier at a gas station.

---

[8] An SVP of 3 indicates that it takes one to three months to learn the position.

In her brief, Plaintiff even admits that many cashier positions are composite positions, combining the job requirements of a cashier and store laborer. And, given the description of the retail cashier position contained in the DOT, it certainly involves more than just cashing out customers. However, because the ALJ found that the Plaintiff could perform her PRW both as it was performed and as it is generally performed, we do not find that his failure to inquire as to the specific demands of the Walmart cashier job warrants remand.

Further, because the ALJ's hypothetical question to the VE included the limitations he found to be substantially supported by the record, we find that the ALJ correctly relied on the ALJ's testimony in concluding the Plaintiff could return to her PRW as a retail cashier as that position was actually and is generally performed. *Martise*, 641 F.3d at (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)).

### E. Res Judicata

Plaintiff also insists that ALJ Murdoch's PRW findings in 2016 constitute res judicata, rendering ALJ Jones' 2020 PRW findings improper. Res judicata, however, only bars subsequent applications for benefits based on the same facts and issues the Commissioner previously found to be insufficient to prove the claimant was disabled. *Robbins v. Sec'y of Health & Human Servs.*, 895 F.2d 1223, 1224 (8th Cir. 1990) (per curiam); *Janka v. Sec'y of Health, Educ. & Welfare*, 589 F.2d 365, 367 (8th Cir. 1978); *see generally* 20 C.F.R. § 404.957(c)(1). The Commissioner can waive the defense of res judicata by reopening the claimant's prior application. *See Boock v. Shalala*, 48 F.3d 348, 351-52 (8th Cir.1995); *White v. Sullivan*, 901 F.2d 94, 95 (8th Cir. 1990) (per curiam). The regulations also provide that a claimant may request that the Commissioner reopen a claim for any reason for up to one year after the initial decision and for good cause shown up to four years after the date of the initial determination. 20 C.F.R. § 404.987. There are,

however, no provisions for petitioning the District Court to reopen a claim, and the Plaintiff has indicated that reopening is not an issue.  (ECF No. 14, p. 320).

As previously mentioned, ALJ Murdoch determined the Plaintiff could not perform her PRW as a department manager, retail store manager, or home health aide because those positions "required interpersonal interaction in excess of what is provided for by her" RFC.  (ECF No. 14, p. 64).  Despite Plaintiff's contention that the 2016 decision and vocational expert testimony therein were "more detailed with further record development," we do not have access to the application paperwork submitted in support of or the transcript from the administrative hearing held regarding that application for benefits.  As such, we can neither say whether the Plaintiff reported the cashier position in her application, nor whether ALJ Murdoch considered the position in her PRW analysis.  We do note, however, that ALJ Murdoch did not mention the cashier job in her 2016 opinion, leading the Court to conclude that it was not considered.  Therefore, because res judicata only applies to prior final decisions based on the same facts and issues, we do not believe that it applies in this case.  20 C.F.R. § 404.957(c)(1); *Hardy v. Chater*, 64 F.3d 405, 407 (8th Cir. 1995) (involving the decisions of two prior ALJs who had reached opposite conclusions about the claimant's ability to perform his PRW and holding collateral estoppel did not apply because second determination was made upon a record different from the first).

### F.    Age Provisions

Plaintiff also asserts that the ALJ erred in his application of the age provisions, as utilization of these provisions would have directed a finding of disabled at Step Five.  The medical-vocational guidelines, or grids, "are a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability." *McCoy v. Astrue*, 648 F.3d 605, 613 (8th Cir.2011) (citing 20 C.F.R. Part 404, Subpt. P, App. 2).  However, the grids do not come into play until step five of the analysis,

when the burden shifts to the Commissioner to show that the Plaintiff has the physical RFC to perform a significant number of other jobs in the national economy.  *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir.2001).  In the present case, the ALJ ended his analysis at step four, finding the Plaintiff could return to her PRW.  As such, the age provisions did not apply, and Plaintiff's argument is without merit.

## IV.    Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the Commissioner's decision to deny benefits be affirmed, and that the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of July 2022.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE